IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| DARRELL COLE BOOTH,<br><br>       Plaintiff,<br><br>vs.<br><br>REALPAGE, INC. a/k/a LEASINGDESK SCREENING and EQUIFAX INFORMATION SERVICES, LLC,<br><br>       Defendants. | Case No.: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Darrell Cole Booth ("Plaintiff") brings this action on an individual basis, seeking statutory and other damages against defendants RealPage, Inc. a/k/a LeasingDesk Screening ("RealPage") and Equifax Information Services, LLC ("Equifax") (collectively, "Defendants"), and alleges, based upon Plaintiff's personal knowledge, the investigation of counsel, and information and belief, as follows:

### PRELIMINARY STATEMENT

1. This is an action to recover damages for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*

2. Defendants have produced and sold consumer reports concerning Plaintiff's background that wrongfully reported that Plaintiff's personal identifying information indicated fraudulent activity and/or that Plaintiff was found guilty of a criminal offense.

3. As a result of Defendants' violations, Plaintiff was harmed by, without limitation, being denied housing and suffering considerable stress and anguish.

1

## PARTIES

4. Plaintiff is a natural person that resides in Arapahoe County, Colorado and qualifies as a "consumer" as defined and protected by the FCRA.

5. Defendant RealPage is a "consumer reporting agency" as that term is defined under 15 U.S.C. § 1681a(f), as it "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties" in exchange for monetary compensation, by means of interstate commerce. RealPage assembles and merges credit and background information from various sources and maintains a database of the assembled and/or merged information from which it then produces new consumer reports. Defendant RealPage is authorized to do business in this state, maintains its principal place of business at 2201 Lakeside Boulevard, Richardson, Texas 75082, regularly conducts business in this judicial district, and can be served with process by way of its registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, Delaware 19801.

6. Defendant Equifax is a "consumer reporting agency" as that term is defined under 15 U.S.C. § 1681a(f). Equifax is authorized to do business in this state, maintains its principal place of business at 1550 Peachtree Street, NW, H46, Atlanta, Georgia 30309, regularly conducts business in this judicial district, and can be served with process by way of its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims have occurred in this district.

## STATEMENT OF FACTS

### a. The FCRA

9. The FCRA is a federal statute designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681a.

10. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports; and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies.

11. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### b. Substantive Allegations

12. In or about the summer of 2020, Plaintiff moved from the State of Colorado to the State of Idaho to be closer to his girlfriend.

13. In or around July of 2020, Plaintiff moved in with his girlfriend to her parents' house, which was located on a street named Portola Drive in Boise, Idaho.

14. In or around September of 2020, Plaintiff and his girlfriend then moved to their own apartment located on a street named Maple Grove Road, also in Boise, Idaho.

15. Plaintiff was then laid off from his place of employment due to circumstances related to the Covid-19 pandemic.

16. Due to economic pressure and the economic distress caused by the circumstances related to the Covid-19 pandemic, Plaintiff fell behind on his expenses, and was forced to rely heavily on his existing credit accounts.

17. Plaintiff's relationship with his girlfriend became strained, and, after breaking up with his girlfriend, Plaintiff moved back to Colorado in or about September of 2021.

18. Although Plaintiff was financially distressed, Plaintiff was able to work out a month-to-month lease of a room from a family friend (the "Month-to-Month Rental Location") at a rate he could afford.

19. In December of 2021, the Month-to-Month Rental Location developed a severe bedbug infestation.

20. Plaintiff did everything he could to resolve the bedbug infestation, including, without limitation, calling exterminators and using various chemical deterrents and repellents.

21. Despite Plaintiff's best efforts, the bedbug situation was not resolved, and Plaintiff decided it was time for him to do what he could to move from the Month-to-Month Rental Location.

22. However, due to his pressing economic situation, Plaintiff was unable to afford to lease a typical apartment at the then-current rental rates.

23. After researching potential rental locations, Plaintiff found an apartment complex named Welton Park located in the Five Points area of Denver, Colorado that offered specialized affordable-housing opportunities.

24. The location of the Welton Park apartment complex was ideal for Plaintiff, who cannot drive due to health-related concerns and heavily relies on both friends located in downtown Denver and public transportation to get around.

25. In addition, Plaintiff had a friend and work associate living close to the Welton Park apartment complex that would be able to transport Plaintiff to and from his place of employment in Englewood, Colorado.

26. On or about February 17, 2022, Plaintiff applied in person to Welton Park.

27. As part of the application process, Plaintiff consented to a background check and provided the Welton Park representative that was facilitating his rental application with his date of birth, the address of his then-current residence (*i.e.,* the Month-to-Month Rental Location), and his social security number.

28. Plaintiff, who was concerned that his recent financial distress would affect his ability to qualify for the apartment, advised the Welton Park representative that his credit score was rather low and asked if he would need to obtain a co-signor in order to qualify for the apartment.

29. In response, the Welton Park representative advised Plaintiff that Welton Park would not deny his rental application on the basis of a low credit score or any other financially related credit issues, and, in the worst case scenario related to any financially related credit

5

issues, Plaintiff would just be required to submit an additional few hundred dollars for his rental deposit.

30. Plaintiff was very relieved to hear this, as Plaintiff could afford submit an additional few hundred dollars for his rental deposit in order to secure an affordable rental apartment.

31. However, on or about February 21, 2022, RealPage sent Plaintiff an email with the subject heading "Your application status at Welton Park" (the "February 21 RealPage Email") which advised that Plaintiff's rental application was being denied.

32. In particular, the February 21 RealPage Email stated the following: "Thank you for your recent application. Your request was carefully considered and we regret that we are unable to approve your application at this time for the following reason(s): Criminal and other public records unsatisfactory [and] Fraud alert."

33. The February 21 RealPage Email further stated that "Our decision was based in whole or in part on information obtained in a report from the consumer reporting agencies listed below," after which it listed Equifax and LeasingDesk Screening (a.k.a. RealPage).

34. Finally, the February 21 RealPage Email was signed "Sincerely, Welton Park."

35. Thereafter, Plaintiff submitted a request to RealPage for a copy of the full background consumer report that RealPage provided to Welton Park.

36. On or about February 24, 2022, RealPage sent Plaintiff an email, attached to which was a copy of Plaintiff's background consumer report dated February 24, 2022 (the "February 24 Consumer Report").

37. The February 24 Consumer Report listed (i) Plaintiff's name; (ii) the address of the Month-to-Month Rental Location as Plaintiff's address; (iii) the month and date of Plaintiff's date of birth; and (iv) the last four digits of Plaintiff's social security number.

38. Then, under the words "Credit bureau warning message," the February 24 Consumer Report reported a section heading titled "EquifaxSAFESCAN" which was followed by the following information:

- EFX: (code: O) ID SCAN: Inquiry SSN issued prior to inquiry date of birth
- SpecialAlert_ADDRESSDISCREPANCY - Input address does not match on-file address
- * SSN Information: /SSN on MDB File: [Plaintiff's social security number]/ SSN on Inquiry: xxx-xx-[the last four digits of Plaintiff's social security number]/ Date Issued: 00-1991 in State: CA

39. The February 24 Consumer Report then reported the address of the Month-to-Month Rental Location as Plaintiff's current address and reported the address of Plaintiff's ex-girlfriend's parents' residence located on Portola Drive and the address of the apartment that Plaintiff shared with Plaintiff's ex-girlfriend located on Maple Grove Road as Plaintiff's two previous addresses.

40. Next to the Portola Drive address, the February 24 Consumer Report reported a column titled "Reported Dates," in which it reported the following text: "From: 2022-02 To: 2020-10."

41. Next to the Maple Grove Road address, the February 24 Consumer Report reported a column titled "Reported Dates," in which it reported the following text: "From: 2022-02 To: 2021-05."

42. Finally, under a section titled "Criminal & Other Records," the February 24 Consumer Report reported "**Offense information** - ID column indicates association between offender and offense," which was followed by the following table:

| ID | Jur code | Disposition | Type/Level | Charge | Record Date | ORIC/ County | Note |
|---|---|---|---|---|---|---|---|
| 1 | COAOCPREMIUM | Guilty | | Fare Evasion | 2017-04-25 | Colorado-2017R911(County) | |

43. Based on the above-referenced information reported on the February 24 Consumer Report, the February 24 Consumer Report was reporting the following:

- A warning that the social security number provided by Plaintiff was issued prior to the date of birth submitted by Plaintiff;

- A warning that the social security number provided by Plaintiff was issued in 1991;

- A warning that there was a discrepancy between the address Plaintiff provided as his current address with the address contained in Plaintiff's file;

- That the Portola Drive address was reported concerning Plaintiff from February of 2022 to October of 2020;

- That the Maple Grove address was reported concerning Plaintiff from February of 2022 to May of 2021; and

- That Plaintiff had a criminal record related to a "Fare Evasion" charge, for which the resulting disposition was "guilty."

44. This information, however, was inaccurate and/or misleading.

45. Plaintiff provided his accurate social security number and his accurate date of birth.

46. Plaintiff's social security number was not issued prior to Plaintiff's birthdate, nor was it issued in 1991, which was at least five years before Plaintiff was born.

47. Despite this, the February 24 Consumer Report reported a warning that the social security number provided by Plaintiff was issued prior to the date of birth submitted by Plaintiff and was issued in 1991.

48. Further, the February 24 Consumer Report reported the date on which Plaintiff's social security number was allegedly issued as "00-1991," which is numerically nonsensical and indicates that there is an error in this record.

49. Plaintiff accurately provided the address of his then-current residence, but the February 24 Consumer Report inaccurately and/or misleadingly reported a warning that there was a discrepancy between the address Plaintiff provided and his actual address on record.

50. In addition, the February 24 Consumer Report nonsensically reported (i) that the Portola Drive address was reported concerning Plaintiff from February of 2022 to October of 2020 (which is chronologically impossible), and (ii) that the Maple Grove address was reported concerning Plaintiff from February of 2022 to May of 2021 (which is chronologically impossible).

51. The manner in which the February 24 Consumer Report reported the information concerning Plaintiff's social security number, the discrepancy concerning Plaintiff's current address, and the information concerning Plaintiff's prior addresses created the inaccurate and/or misleading impression that there were concerns of fraud in connection with Plaintiff's application and/or the information Plaintiff provided when submitting his application.

52. Finally, the February 24 Consumer Report's reporting that that Plaintiff had a criminal record and was found guilty of the charge of "Fare Evasion" was also inaccurate and/or misleading.

53. Plaintiff had never been charged with a crime, let alone found guilty of one.

54. Plaintiff *had* been issued a traffic citation for failure to present a valid transit pass, but Plaintiff had never been charged with or found guilty of any crime related thereto.

55. The manner in which the February 24 Consumer Report reported the information concerning the alleged "Fare Evasion" charge created the inaccurate and/or misleading impression that Plaintiff had a criminal record and was found guilty of a criminal charge of "Fare Evasion."

56. As demonstrated by the February 21 RealPage Email, the inaccurate and/or misleading information reported on the February 24 Consumer Report directly resulted in the denial of Plaintiff's rental application.

57. Upon information and belief, the inaccurate and/or misleading information reported on the February 24 Consumer Report was reported to RealPage by Equifax.

58. Both Equifax and RealPage knew or should have known of the inaccurate and/or misleading nature of the information they were reporting concerning Plaintiff's social security

10

number, as (i) Plaintiff had provided his accurate social security number and date of birth, which was sufficient to determine the accuracy of Plaintiff's social security number, and (ii) the manner in which the alleged issue date of Plaintiff's social security number was reported on the February 24 Consumer Report indicated there was an error related to the reported record.

59. Further, both Equifax and RealPage knew or should have known of the inaccurate and/or misleading nature of the information they were reporting concerning Plaintiff's current address and previous addresses, as (i) Plaintiff had provided the accurate address of his then-current address, which was sufficient to determine the accuracy of Plaintiff's current address, and (ii) the manner in which the information concerning Plaintiff's addresses was reported on the February 24 Consumer Report indicated there was an error related to the reported records.

60. Finally, both Equifax and RealPage knew or should have known of the inaccurate and/or misleading nature of the information they were reporting concerning Plaintiff's alleged criminal history, as Plaintiff was never found "guilty" of a charge of fare evasion.

61. After receiving the February 21, 2022 email from RealPage, Plaintiff called Welton Park, advised a Welton Park representative that he received the February 21, 2022 email from RealPage, and informed the Welton Park representative that the report on which they had made their decision to deny his application was inaccurate, as (i) there was no reason there should be a fraud alert on Plaintiff's report, and (ii) Plaintiff had no criminal record or other public records that should be flagged as unsatisfactory for his rental application.

62. The Welton Park representative took Plaintiff's information and stated that they would submit a dispute to RealPage on his behalf.

63. Upon information and belief, Welton Park submitted a dispute to RealPage and Equifax on behalf of Plaintiff concerning the accuracy of the information that RealPage and Equifax reported to Welton Park.

64. Upon information and belief, both RealPage and Equifax received the dispute that Welton Park submitted on behalf of Plaintiff.

65. However, despite Plaintiff's dispute, the damage was done.

66. Subsequent to Plaintiff's dispute, Plaintiff again called Welton Park for an update on his application but was advised by a Welton Park representative that Welton Park had received the results of Plaintiff's dispute, that no information on Plaintiff's background consumer report was changed or updated, and they would not be reconsidering the denial of his application.

67. Plaintiff was significantly damaged by the Welton Park denial, as Welton Park offered affordable housing that was highly coveted and subject to a waitlist of people looking to rent an apartment from Welton Park.

68. Without the benefit of the ability to rent an apartment from Welton Park, Plaintiff was left without a place to rent, as Plaintiff could not afford to otherwise rent a house or apartment at the then-current rental rates.

69. But for Defendants' inaccurate and/or misleading reporting and failure to correct such reporting after Plaintiff disputed such reporting, Plaintiff's rental application would have been approved by Welton Park, and Plaintiff would have benefitted from the location, affordability, and overall comfort of the Welton Park apartment complex.

70. This would have included Plaintiff's ability to benefit from public transportation and the assistance of Plaintiff's friends to get around, including, without limitation, to and from Plaintiff's place of work.

71. In addition, because of Defendants' FCRA violations, Plaintiff was forced to stay in the Month-to-Month Rental Location and suffer from the bed bug infestation during the period in which his rental application would have otherwise been accepted.

72. Plaintiff suffered from extreme physical aggravation over such period, as Plaintiff was constantly bitten by the bedbugs, which resulted in considerable pain and discomfort, as well as visible skin irritation, swelling, and scarring resulting from the bug bites.

73. In addition to the physical aggravation, Plaintiff suffered extreme mental distress, as Plaintiff had become paranoid and embarrassed by the visible bug bites.

74. As a result of the circumstances created by Defendants' FCRA violations, Plaintiff developed insomnia and was forced to go to an urgent care center for a sleep aid prescription just to fall asleep.

75. Further, Plaintiff was forced to take time off from work due to his emotional distress.

76. Plaintiff's mental distress caused by these circumstances became so great that Plaintiff has been driven to thoughts of suicide, to the extent that Plaintiff's ex-girlfriend had to call the police to intervene.

77. But for Defendants' inaccurate and/or misleading reporting and failure to correct such reporting after Plaintiff disputed such reporting, Plaintiff would not have suffered from the aforementioned harm.

78. Upon information and belief, the date upon which a social security number was issued is not a matter of public record.

79. Upon information or belief, the Social Security Administration did not report or otherwise inform Equifax or RealPage that the social security number provided by Plaintiff was issued prior to Plaintiff's birth date, or that the social security number provided by Plaintiff was issued in the year 1991.

80. Upon information or belief, neither Equifax nor RealPage contacted the Social Security Administration prior or subsequent to Plaintiff's dispute in order to verify the details concerning the reported concerns related to Plaintiff's social security number.

81. Upon information or belief, neither Equifax nor RealPage contacted the governmental agency that maintains the records related to Fare Evasion record for which Plaintiff had allegedly been found "guilty" to verify the accuracy of such records, as reported.

82. As demonstrated by Defendants' reporting, Defendants fail to maintain and employ reasonable procedures to assure maximal accuracy of the consumer information they provide to third parties.

83. Defendants know their services are used to make significant consumer decisions concerning housing.

84. Nevertheless, instead of employing reasonable procedures as required by the FCRA, Defendants, upon information and belief, blindly collect information in an unreliable manner without verifying the information they collect.

85. Alternatively, Defendants, upon information and belief, blindly collect information in an unreliable manner from unreliable third-party vendors in order to repackage and sell such information in their own consumer reports.

86. Upon information and belief, Defendants buy consumer information from third-party vendors that do not have reasonable procedures in place to ensure that the information they sell is maximally accurate.

87. Upon information and belief, none of Defendants' third-party vendors provide warranties as to the accuracy of the information they sell.

88. Upon information and belief, Defendants do not independently investigate the information they buy from third-party vendors before reporting such information in consumer reports.

89. Upon information and belief, Defendants do not exercise the due diligence necessary to ensure the reliability of their third-party vendors, nor do they conduct periodic quality assurance audits to ensure that they are receiving reliable information from their third-party vendors.

90. At common law, Defendants' conduct would have given rise to causes of action based on defamation and invasion of privacy.

91. Upon information and belief, Defendants knowingly and willfully maintain deficient procedures because employing reasonable procedures to ensure they meet their duties under the FCRA would reduce their profits.

92. Defendants have been sued under the FCRA in the past.

93. Because Defendants have been sued under the FCRA in the past, Defendants have actual notice that their respective procedures often result in the violations of the FCRA, as applicable.

94. Despite such notice, Defendants recklessly, knowingly and/or willingly failed and continue to fail to employ procedures that assure they meet their duties under the FCRA.

95. The injuries suffered by Plaintiff as a direct result of Defendants' violations, as alleged herein, are the type of injuries that the FCRA was enacted to prevent.

96. Defendants' violations of the FCRA were willful. Accordingly, Plaintiff is entitled to statutory, actual, and punitive damages under 15 U.S.C. § 1681n.

97. Alternatively, Defendants' violations of the FCRA were negligent. Accordingly, Plaintiff is entitled to statutory and actual damages under 15 U.S.C. § 1681o.

98. In any event, Defendants are liable for Plaintiff's reasonable attorney's fees and costs, pursuant to 15 U.S.C. §§ 1681n and 1681o.

### CAUSES OF ACTION
### COUNT I
### Against Defendants for Violations of the FCRA, 15 U.S.C. § 1681e

99. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

100. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

101. Defendants violated § 1681e(b) because they failed to follow reasonable procedures to ensure the maximum possible accuracy of the information they attributed to and reported concerning Plaintiff.

102. Specifically, Defendants willfully, intentionally, recklessly, and/or negligently violated § 1681e(b) by reporting the inaccurate and/or misleading information on consumer reports concerning Plaintiff in the manner alleged herein.

103. Defendants' misconduct was a direct and proximate cause of Plaintiff's injuries, as alleged herein, and Defendants are therefore liable to Plaintiff for their negligent and willful failures to follow reasonable policies and procedures.

104. As a result of Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered statutory and actual damages as described herein and is entitled to recover actual and punitive damages under 15 U.S.C. §§ 1681n and 1681o.

## COUNT II
### Against Defendants for Violations of the FCRA, 15 U.S.C. § 1681i

105. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

106. Upon receiving a consumer's dispute, consumer reporting agencies are legally required to conduct a reasonable investigation and correct the disputed information, as follows:

> . . . *if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer*, and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, *the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information*, *or delete the item from the file* in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. §1681i(a)(1) (emphasis added).

107. Consumer reporting agencies are further required to maintain reasonable procedures to prevent the reappearance of inaccurate information, as follows:

> A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph….

*Id*. §1681i(a)(5)(C).

108. Defendants violated § 1681(i) on one or more occasions, as Plaintiff disputed the inaccurate and/or misleading information that Defendants reported concerning Plaintiff, and still, Defendants willfully, intentionally, recklessly, and/or negligently failed to perform a reasonable reinvestigation and correct or suppress the inaccurate information.

109. Moreover, Defendants also violated § 1681(i) on one or more occasions, as they willfully, intentionally, recklessly, and/or negligently failed to maintain reasonable procedures to prevent the reappearance of the inaccurate and/or misleading information that Plaintiff disputed in Plaintiff's file and in consumer reports concerning Plaintiff.

110. Defendants' violations were a direct and proximate cause of Plaintiff's injuries, as alleged herein, and Defendants are therefore liable to Plaintiff for their negligent and/or willful failures to follow reasonable policies and procedures.

111. As a result of Defendants' violations of 15 U.S.C. § 1681i, Plaintiff suffered statutory and actual damages as described herein and is entitled to recover actual and punitive damages under 15 U.S.C. §§ 1681n and 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands a judgment:

    i.     Awarding Plaintiff statutory money damages, actual damages and punitive damages as allowed by 15 U.S.C. §§ 1681n and/or 1681o, including pre-judgment and post-judgment interest;

    ii.     Awarding attorney's fees and costs as required by 15 U.S.C. §§ 1681n and/or 1681o, and other relief; and

    iii.     Awarding such other relief as to this Court may seem just and proper.

## JURY DEMAND

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

DATED: March 26, 2022                 **THE CONSUMER JUSTICE LAW FIRM**

                                           */s/ David A. Chami*
                                           DAVID A. CHAMI

8245 N. 85th Way
Scottsdale, AZ 85258
dchami@cjl.law
(480) 626-2359
*Attorneys for Plaintiff*